# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | | |
|---|---|---|
| JAMES JOINER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:05-CV-407 JVB |
| | ) | |
| MERRILLVILLE COMMUNITY | ) | |
| SCHOOL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment and

Defendant's Motion Regarding Inadmissibility of Some Exhibits Relied Upon by Plaintiff in his

Response in Opposition to Defendant's Motion for Summary Judgment.  For the reasons set

forth below, Defendant's Motion for Summary Judgment [DE 15] is **GRANTED**.  Defendant's

Motion Regarding Inadmissibility of Some Exhibits Relied Upon by Plaintiff in his Response in

Opposition to Defendant's Motion for Summary Judgment [DE 25] is **DENIED AS MOOT**.

## BACKGROUND

On November 10, 2005, Plaintiff filed his Complaint in this case.  (Def.'s Ex. 1.)  In his

Complaint, Plaintiff alleges that Defendant discriminated against him on the basis of his African-

American race and retaliated against him for engaging in protected activity in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Civil Rights Act of 1866,

42 U.S.C. § 1981.  (*Id*.)  Specifically, Plaintiff alleges that he was the victim of race

discrimination and retaliation when Defendant decided not to renew his contract as Principal of

Clifford Pierce Middle School.  (*Id*.)  Plaintiff further alleges that Defendant held him to a higher

standard than similarly situated Caucasian Principals and subjected him to terms and conditions of employment that were different and less favorable than those enjoyed by similarly situated Caucasian employees.  (*Id.*)

Defendant filed a Motion for Summary Judgment on March 1, 2007.  Defendant contends that summary judgment is warranted here because Plaintiff has failed to make out a prima facie case of race discrimination.  Defendant argues that Plaintiff was not meeting its legitimate performance expectations and has not shown that it treated similarly situated persons outside the protected class more favorably.  Moreover, Defendant asserts that it has legitimate non-discriminatory reasons for its actions which were not a pretext for discrimination or retaliation. Plaintiff claims he has satisfied his prima facie burden and Defendant's reasons for not renewing his Principal contract were, in fact, a pretext for race discrimination and retaliation.

In addition to its Motion for Summary Judgment, Defendant filed a Motion Regarding Inadmissibility of Some Exhibits Relied Upon by Plaintiff in his Response in Opposition to Defendant's Motion for Summary Judgment.  In this motion, Defendant seeks to strike Plaintiff's Exhibit D (newspaper articles), and Exhibits E and F (race statistics) from his Appendix (Designation of Evidence) because they constitute inadmissible hearsay.  Next, Defendant moves to strike paragraphs 3, 4, 8, and 10 of Plaintiff's Exhibit J (Joiner Affidavit) because these paragraphs are based on inadmissible hearsay rather than personal knowledge. Defendant further requests that Plaintiff's Exhibit K (Leeke Affidavit) be stricken because it is "only based upon incomplete subjective belief" and that paragraphs 4, 5, 7, 9, and 12 of Plaintiff's Exhibit L (Winborn Affidavit) be stricken because they constitute inadmissible hearsay.  Defendant also contends that paragraphs 5, 8, 9, 10, 13, 14, and 15 of Plaintiff's Exhibit L are irrelevant.

## FACTS

The parties do not dispute the following facts:

### A.      The Parties

Plaintiff James Joiner, who is African-American, was employed by Defendant Merrillville Community School Corporation ("Defendant" or "MCSC") as Principal of Clifford Pierce Middle School during the 2002 through 2004 school years.  (Def.'s Exs. 1, 3–B, 7.)

Defendant is located in Northwest Indiana and serves about 7,000 students. (Def.'s Mem. at 4.)  During the relevant period, Dr. Tony Lux, Ph.D., was Superintendent.  Defendant is governed by the Board of School Trustees ("School Board") which is comprised of five elected persons.  (*Id.*)

### B.      2002–03 School Year

### (1)      *Basketball Game*

On January 7, 2003, Plaintiff was issued a written reprimand by Dr. Lux for failing to supervise an eighth-grade boys basketball game.  (Def.'s Ex. 9.)  An excerpt from Dr. Lux's written reprimand states:

> On Thursday evening, December 19, 2002, the 8th grade boys basketball game ended prematurely due to verbal altercations between the Pierce basketball coaches and the referees. As you have stated, you were the administrator on duty that night but left the premises after the first quarter of the second game. While your intent was to return, you did not. You have acknowledged to me that you were wrong in your decision and have accepted responsibility for that decision. However, I must reprimand you for that decision.

(*Id.*)

**(2)   *Teachers' Union Grievance***

On April 11, 2003, five Pierce team leaders attended a team leader meeting.  (Def.'s Ex. 11.)  Following that meeting, Plaintiff read the minutes of the team leader meeting which *inter alia* complained about the school's climate which they felt was negative.  (Def.'s Ex. 12.) Plaintiff sent an email to the entire staff on April 12, 2003, regarding the team leader meeting and stated, in pertinent part, that the team leaders' concerns were "a bunch of noise from people who have a negative attitude, and like to complain.  As usual you offer no solutions, you don't focus on what you can do to make things better, you just spout out a lot of negativity about what you don't like."  (Def.'s Ex. 13.)  Plaintiff then continued: "Some of you all are so self-centered, so that all you can see is your little patch of the school and your interest goes no further than that." (*Id.*)

Plaintiff sent Dr. Lux an email on April 21, 2003, stating *inter alia*:

I feel that these people need to be confronted, they need to be exposed for what they are, they need to feel uncomfortable and they need to think . . . I will do my best to follow your authority but I will not lie down to these people and I will not kowtow to them and I will not allow them to dictate the agenda to me. I realize that doing so carries consequences . . .

(Def.'s Ex. 18.)  Dr. Lux responded to Plaintiff's email on April 22, 2003, stating, in pertinent part:

Regarding some concerns I feel you are raising, let me clarify a couple of things while at the same time try to pass along what I have learned over the years about dealing with antagonistic staff. First, I am not asking you to lie down or kowtow to teachers who nurture negativity. I do want you to confront injustice. However, the whole key is in the manner that it is done. Your staff knows exactly who is responsible for the negativity. I have found that the most successful ways to

4

deal with people who submit questions that are intended to bait someone, or which may imply that things are so terrible, is to sit down with them directly. If they send something out to everyone then of course you should send out a reply to challenge and clarify the information. In this recent situation you chose to make public what they submitted to you and then to make public your feelings about what they submitted.  So be it. I think you made yourself very clear. Now you have to take your staff beyond this. . . The worst thing would be for you to be seen as being vindictive. The best thing is to be seen as one who will not allow subversion to go unchecked but at the same time be seen as someone who confronts it in a way that is above reproach. I am not asking you to cave to anyone. I just don't want you to give anyone ammunition that will turn the focus from the real problem.

(Def.'s Ex. 19.)

On April 22, 2003, Plaintiff emailed the Pierce Middle School staff an apology:  "I express my regret to those whom I offended.  I do not want to publicly criticize anyone."  (Def.'s Ex. 14.)  Plaintiff continued:

I only ask that you respect my authority and responsibility to make decisions that affect this entire building in the same manner that you would like your authority and responsibility to make decisions concerning your classroom to be respected. Please understand that there are higher authorities than myself who set guidelines that we must adhere to and most importantly, whenever possible make the connection between your concern and our primary mission of promoting student growth.

(*Id*.)

The Merrillville Community Teachers Association ("MCTA") filed a grievance on May 1, 2003, asserting that Plaintiff had violated certain sections of the teachers' union contract. (Def.'s Ex. 11.)  The grievance was essentially resolved by several meetings between the MCTA leadership, central office administration staff, legal counsel, and Plaintiff; a climate audit of Pierce Middle School conducted by the Indiana Principals Leadership Academy; mediation conducted by Dr. John Leeke, Ph.D.,[1] an independent mediator/facilitator; and a half-day

---

[1]Leeke holds a Ph.D. in Organizational Behavior, and has operated his own consulting firm since 1985 "assisting organizations in the areas o[f] organizational dynamics, team building, and organizational issues in the area of diversity/difference."  (Leeke Aff. ¶ 3.)

professional development exercise.  (Def.'s Exs. 15–17.)  In the grievance disposition, Dr. Lux noted that "some members of the Pierce MCTA building representatives inappropriately bypassed direct and specific communication with the Pierce Principal and Ass[istant] Principals and even included actions that could be considered as undermining of the Principal's school authority." (Def.'s Ex. 15.)  Plaintiff ultimately apologized and acknowledged that "email communication between the Pierce Principal and staff should be of a professional manner and not include publicly disciplining, belittling or demeaning comments toward any individual." (Def.'s Ex. 3.)

**(3)**      *2002–03 Administrative Evaluation*

In Plaintiff's 2002–03 administrative evaluation, Dr. Lux wrote:

> You inherited a situation in which the previous leadership style was one where the Principal focused on public relations and allowed the staff to set instructional and behavior direction for itself. Your leadership style is one of a hands-on Principal who is very much involved in all aspects of the school's operation and that involves strong leadership and direction from the principal to the staff. This approach, being significantly different from the past, along with the pre-disposition of a hand full of staff members who have tried to control the decision making process, has led to adversarial interaction and turmoil within the school. This turmoil has boiled over into public admonishment of staff members resulting in formal grievances. One outcome of the grievances has been an interview audit of the Pierce staff. The findings of this audit will contribute to developing a plan for improving staff and administrative interaction.
>
> There are definite areas of positive strength and areas for definite improvement. For improvement, these areas primarily involve communication with respect to decision making and avoiding public chastisement of staff that is perceived as demeaning and threatening. Focused effort needs to be exerted in better defining and explaining to staff how decisions and consensus will be reached. Based on the results of the interview audit, there seems to be a lack of understanding in this area by some staff.
>
> The issue of public chastisement is one where you have already

6

acknowledged that you acted inappropriately even though it was done with the purpose of bringing a major issue to head. However, there are claims from the interview audit that this issue even goes beyond the negative emails and extends into the area of group meetings and discussions with individuals in open areas. The perception is that you may sometimes lose patience in the presence of others. There are claims by some of fear and lack of trust to speak to you either privately or publicly. This is what you are faced with overcoming. I believe that these perceptions are not the perceptions of the majority of your staff.

It must be noted that you were given a written reprimand for failure to be at your supervisory post during a basketball game where a very negative incident occurred involving Pierce coaches. However, you handled the aftermath of that situation with great professionalism and fairness. You also seem to have put in place procedures that will improve student behavior at athletic contests and in the carrying out of successful public programs at Pierce. The positive improvement of school dances has also been significant.

. . . .

A Principal does not have the luxury of losing control of emotions publicly. If there is inappropriate behavior on the part of some it must be dealt with in a manner that will reassure all other staff that the Principal will exemplify the values of fairness and sensitivity. There are always procedures to follow that will not allow anyone to be disrespectful or disruptive, however they are to be followed in an appropriate manner.

(Def.'s Ex. 10.)

Dr. Lux also discussed Plaintiff's many positive accomplishments he had during his first

year as Principal of Pierce Middle School and noted:

Despite some negative naysayers on your staff, you have accomplished a great deal in your first year as Principal at Pierce Middle School. You have clearly established that you have high expectations for staff and students. You have established that student achievement is of the highest priority and that decisions will be data-driven. You have created a mechanism for compiling and distributing student achievement data. You have improved communication with parents. You have improved the disciplinary environment. You have actively participated in principal's meetings and at administrative council. You have improved student behavior at public events and dances. You are constantly in communication with central administration. Perhaps most importantly, you have demonstrated that you care about the students who attend your school. I am impressed with your clear sense of what you value and the principles by which you operate. You are obviously committed to

7

your job and I feel confident that overall you are leading Pierce to becoming a better place for learning and for working. I look forward to our continued partnership within the Merrillville Schools.

(*Id*.)

Plaintiff signed the evaluation on June 11, 2007, noting: "I am very appreciative of the . . . evaluation. It is an accurate assessment of my year and captures my successes, challenges, and areas that need improvement. The goals for 2003–2004 will help me focus my efforts and serve as an incentive for my improved performance for next year." (Def.'s Ex. 10.)

## C.      2003–04 School Year

**(1)      *Email Exchanges***

On August 23, 2003, Plaintiff emailed some of Pierce Middle School's technology personnel regarding a web-based teacher module stating among other things:

"Until you can get assurance that the web-based teacher module can respond in 10 seconds or less at 95% reliability or higher; you need to return to entering the attendance via the old AS400 interface."

(Def.'s Ex. 22.) Dr. Lux responded to Plaintiff's email on August 25, 2003: "I need to point out to you that your tone of voice in this email and a previous one you sent out regarding Point of Sale concerns shows too much impatience and demand for immediate regression to an old system." (*Id*.) Plaintiff responded to Dr. Lux via email on August 26, 2003: "I appreciate your comments, but I respectfully cannot agree with your conclusion about impatience and immediate regression. I think it misses the point." (*Id*.)

On October 9, 2003, in response to issues relating to Middle School supervision at High School facilities, Dr. Lux sent the following email to Plaintiff, Dr. Mark Sperling, Merrillville

8

High School Principal, and other school staff:

> I have read the various exchanges of emails stemming from the complaint of not properly securing a high school facility after its use for middle school athletics. I want this issue to end here. I think everyone needs to take a step back and recognize each other's frustrations and burdens of responsibilities. I certainly understand that each of our schools and all of our administrators feel overburdened at times. Everyone has to handle much more than others are aware of. If someone has to use someone else's facilities, then there are responsibilities that must be met. But also, having to travel to other facilities carries with it many related problems and logistical issues that can be overlooked by others. We must be able to understand that everyone has many demands that are not readily apparent to others. Unfortunately, when our own burdens become frustrating we are tempted to think that others are taking advantage of us, or are not truly recognizing how difficult . . . the demands [are that are] being placed on us. We all need to be sensitive to this and we are all better served by trying to explain our concerns without the use of sarcasm. I think enough has been said and everyone really knows how they need to be both responsible and sensitive to the fact that we have to take care of each other's facilities while recognizing that sometimes there are so many things to deal with that some things can sometimes get overlooked.  The important thing[] is to do better next time. Let's end this here so that we don't go down a road that creates unnecessary ill will.

(Def.'s Ex. 23.)  Shortly thereafter Plaintiff emailed Dr. Lux stating *inter alia*:

> I appreciate your comments, but this issue is not limited to Middle School Supervision; we [were] shown a complete lack of respect by the High School on a number of occasions. They need to know that if they are going to continue to show that amount of contempt for us, that we will challenge that viewpoint of us. Unfortunately, the ill will already seems to exist.

(*Id*.)

In another instance, Plaintiff sent the following October 27, 2003, letter via an email as

well as a hard copy to the Pierce staff:

> I wish to state clearly, the purpose of this communication to you all. It is my intent to acknowledge and apologize to any and all staff members for any actions that I have carried out in the service of my responsibilities as principal of Pierce Middle School, since arriving here in July of 2002, that has caused hurt feelings.

> I have become acutely aware that my style and passion causes some to be intimidated, cautious, or hesitant in interactions with me. As all of us have, I have made mistakes. I am certain that as long as I am alive, mistakes will occur. I believe

I learn from my mistakes. I would ask you all to allow me to learn and grown, as I will do for you.

We have a great challenge here at Pierce. I ask that each of you accept this acknowledgment and apology and let us move on.

If there is any staff member who feels that this letter fails to respond to his/her need for acknowledgment and apology, please talk to me.

(Def.'s Ex. 20.)  Dr. Lux responded to Plaintiff's apology stating, in pertinent part, that it "was a

magnanimous gesture" on his part.  (Def.'s Ex. 21.)


**(2)**     *2003–04 Administrative Evaluation*

In Plaintiff's 2003–04 administrative evaluation, Dr. Lux wrote:

This past school year has been an evolution in the development of the dynamics between yourself and the Pierce staff. It has been filled with a myriad of experiences and events that have brought you and the staff of Pierce Middle School to a much improved level of interaction. The school year has ended with, I believe, the promise of a fresh start and a willingness among your staff to work together in a more collegial fashion and in a more cooperative fashion with the administration. Through your efforts and cooperation with consultation and facilitation of Dr. John Leek[e], not only have you improved your relationship with your staff, but you have established your position as the leader of Pierce Middle School.

(Def.'s Ex. 24.)  Dr. Lux indicated that there were several "areas for continued improvement"

needed by Plaintiff which included "[m]ov[ing] towards improved working relationships with

the Teachers' Association representatives" and "[p]atience and emotional control in difficult

circumstances."  (*Id*.)  Dr. Lux also noted Plaintiff's diligent efforts to improve student academic

achievement, his tireless work, his attention to details, and the fact he had achieved the highest

percentage of students who had passed state standardized tests among all of Defendant's schools.

(*Id*.)  Plaintiff signed his evaluation with the note "thank you."  (*Id*.)

**D.      2004–05 School Year**

**(1)      *Split Lip Incident***

On September 15, 2004, an altercation between a seventh-grade Caucasian girl and a

seventh-grade African-American boy occurred when they exited a school bus after school.

(Def.'s Exs. 25 & 28, Lux Dep. at 155:9–25; 156:1–14.)  A series of emails began on September

21, 2004, when Plaintiff advised Dr. Lux that the girl's parents would be contacting Dr. Lux, and

Plaintiff requested sanctions against the parents via the School Board's Civility Policy as a result

of a telephone conversation he had with them regarding the altercation.  (Def.'s Ex. 25.)

After Dr. Lux spoke with the girl's father, he sent Plaintiff the following email on

September 21, 2004:

> [The girl's father] did get through to me this morning. He was very calm and
> controlled on the phone. His claim is that you were talking to him in a loud voice,
> yelling at him and that he interrupted you to tell you that he would not be talked to
> like that. He admitted he hung up because you would not listen to him and kept
> yelling at him. He said he couldn't believe that you kept calling him back and that
> you continued to not listen to him and caused his wife to be in tears. I told him that
> your side of the story was just the opposite.
>
> Regarding the incident with his daughter, he said that his daughter came home with
> a split lip from being punched/hit in the face and that is why they were so upset. I
> told him that that was totally unacceptable for a boy to hit a girl like that. However,
> that witnesses said that the girl did hit the boy first (although [the girl's father] said
> that she only was trying to get his attention for some other students and sort of
> tapped him on his shoulder or back of his head). I reiterated that the witnesses
> seemed to claim that it was more than just a tap.
>
> What exactly was the extent of what she did to the boy based on witnesses?  Was it
> a light slap or tap, or did she really hit him?
>
> Did the boy actually punch her in the face and give her a split lip?
>
> I would assume that if any of this is close that there would be quite a difference in
> the two punishments?

> [The girl's father] said he would rather not have to have conversations with you and wanted to know how he would find out about his daughter and I suggested one of the Ass[istant] Principals, unless you want to try and resolve this situation further [with the girl's parents].

(Def.'s Ex. 25.)  Plaintiff responded to Dr. Lux, in pertinent part, as follows:

> [The girl's father] is not being factual. He didn't want to hear about his daughter's culpability, and he tried to control the conversation, when he couldn't then he started getting louder and louder they were both talking at the same time, I could hear him from the other side of the room through the phone's mouthpiece.  I would venture a guess from his wife's racial comments that anytime a "black man" stands up to him, then he would consider that person to be loud.

> I only called him back once, and that was to clarify to his wife that the child was not yet suspended.

> She is the one who tried to hold a conversation, [be]cause she wanted to continue to plead her case, then when he returned to the room, she started again and that's when she hung up.

> . . . .

> The witness (a white female student, whom their daughter named) and the boy, said she hit him.

> There will be no difference in punishments . . .

(*Id*.)

A series of email exchanges took place between Plaintiff and Dr. Lux on September 22, 2004, regarding the nature of the punishments for the boy and girl involved in the altercation. (Def.'s Ex. 25.)   In an email sent that day at 8:56 a.m., Dr. Lux stated:  "If what happened is that a girl slapped a boy on the back of the head and the boy turned around and punched the girl in the face, I see the two blows as significantly different and requiring different consequences." (*Id*.)  In response, Plaintiff wrote to Dr. Lux at 9:15 a.m. stating that "I don't, because we teach our kids to not use their hands to settle their problems. . . . Tell me how you would explain to the

boy and his parents how his actions required a more serious consequence." (*Id.*)  After several

more email exchanges, Dr. Lux sent Plaintiff the following email at 6:06 p.m.:

> I agree that the girl initiated the problem and was wrong for hitting and deserves a consequence. You are also stating that the boy did not react in self-defense but committed a pre-meditated retaliation. I think you should know what kind of hit the girl gave the boy. I also do not accept that getting punched in the face and getting a busted lip is just a consequence of her actions and she should be prepared to pay that high of a price. Just because someone initiates the problem doesn't mean the other person gets to do whatever they want and the consequences are exactly the same.  There is such a thing as over reaction and disproportionate retaliation. I expect all administrators to recognize that fact.

(*Id.*)  Plaintiff responded to Dr. Lux's email at 6:54 p.m.:

> I know what overreaction is, I know what disproportional is and I know what premeditation is. I also know that none of those have anything to do with this case.
>
> I also know that I talked with both students and I talked with two witnesses. I also talked with [the girl's parents], I am fooled neither by their charade nor their lies. If you are, it won't be the first time that you have taken that position when it comes to me.

(*Id.*)  Plaintiff ultimately gave the boy involved in the altercation a more severe punishment than

the girl.  (*Id.*)


**(2)**    ***Hair Braid Incident***

On October 25, 2004, Plaintiff met with the parents of two seventh-grade African-

American students regarding the wearing of braids or corn rows in their hair while participating

on the basketball team.  (Def.'s Ex. 26.)   The parents opposed the Varsity High School

Basketball Coach's policy banning hair braids or corn rows from being worn by members of the

basketball team.[2]   (Def.'s Mem. at 14.)

---

[2]The Varsity High School Basketball Coach established guidelines regarding appropriate dress for all basketball players including those attending Pierce Middle School.  (Def.'s Ex. 28, Lux Dep. at 47:9-48:10.)

On October 27, 2004, Plaintiff sent a memo to Larry Swanson, High School Athletic Director, Jim East, Varsity High School Basketball Coach, Dr. Lux, and others regarding the wearing of hair braids by basketball team members stating *inter alia*:

> And I have directed you all to not disallow . . . these two or any other students from participating in [b]asketball, just because [they have] braids. I have also shared this with the parents and the students on 10/27/04.
>
> The basis for my decision is expressed below.
>
> I do believe that it is important to teach kids to make and honor difficult decisions. You all as Basketball coaches and Athletic Director have faithfully fulfilled your responsibilities, in communicating the requirements of being on the basketball team at Pierce.
>
> The students may very well, be willing to cut their hair, in order to be a member of the team. Clearly, their parents at this time are not willing for them to do so, and as we discussed on 10/27, there has not been a parent meeting, as of yet. Waiting until after the cuts are made to have a parent meeting is a common and acceptable practice at [MCSC]. However, in doing so, the parents of these two students were not afforded the opportunity to make a decision on this particularly difficult issue, prior to this time. Furthermore, the parents real concern is that the students should not have to make this particular choice. I happen to agree with them, in this instance. I discussed the basis for my agreement with you all at the meeting on 10/27. In particular, by specifically banning that students cannot wear braids, the rule, although in a benign sense, discriminat[es] against one group, African-Americans. For many African-Americans there are very deep historical, cultural and spiritual reasons for why they wear their hair in a natural style that originated in West and East Africa, prior to people of African descent coming to America, and continues to this today. I do not support a rule that says in order for a Pierce Middle School student to participate in an extracurricular activity, he/she must deny such an important part of his/her ethnic identity. I do not know anywhere else where we ask our students to do that. So the rule is also inconsistent with much of our standard operating procedure.
>
> . . . .
>
> I could not find anything in our student handbook and/or our Board Policy that establishes this rule and therefore I am exercising my authority as the Principal, to make this decision. ***Hair can be braided. You can insist that hair be neatly groomed, worn no longer than shoulder length, and worn close to the scalp.*** Please revise your written rules accordingly, and . . . give me a copy of those written rules,

14

that include this provision.

(Def.'s Ex. 26.) (Emphasis in Original.)  On October 28, 2004, Plaintiff sent Dr. Lux another

email entitled "Short Summary on the Historical, Cultural and Spiritual Significance of Braided

Hair to African-Americans."  (Def.'s Ex. 27.)

> On November 2, 2004, Dr. Lux responded to Plaintiff's email:

> My position regarding the basketball hair rule at Pierce is to allow the arranging of hair in the form of braids on the top of the head as long as they meet the established criteria of being neat, no cut outs or designs, and meet the two inch hair length requirement (shoulder length hair has never been allowed). While the argument has been made that the braiding of hair by boys is a recognized part of African American culture and to disallow it would be a restriction that would apply to one group of individuals, the length of hair rule applies across all groups of students and has been an accepted standard of neatness and uniform appearance for members of an athletic team for many years. I believe that the philosophy of this school corporation has been that team sports should demonstrate cohesiveness and uniformity of purpose where attention to the individual is sacrificed for attention to the team as a whole.

> I do not know if the Board will actually have a public discussion on this issue or simply acknowledge my decision by not publicly reviewing it . . .

> . . . .

> Again, I will let you know . . .  about these decisions being official and for giving out this info[rmation] to the Athletic Directors and coaches.

(Def.'s Ex. 26.)

In an effort to resolve this matter and share views on this issue, Dr. Lux set up a meeting

on or about November 8, 2004 with the two parents of the Pierce Middle School basketball

players, two parents of High School basketball players, one parent of a graduated High School

player (who is a former State Senator and Judge), the High School Principal, the High School

Athletic Director, the Varsity High School Basketball Coach, two School Board members, and

Plaintiff.  (Def.'s Exs. 3–K, 26, 28, Lux Dep. at 88:5–90:2.)  The following is an excerpt of the

report of that meeting:[3]

> The parents of the middle school players stated their request and rationale for the no braid rule to be lifted. The high school basketball coach began to talk and was almost immediately interrupted by the Pierce Principal. After that the rest of the meeting involved the high school parents giving their support for the rule and then being challenged and interrupted by the Pierce Principal. The former Senator and former Judge interrupted the Pierce Principal and requested to be heard. Once he started to talk, he was continually interrupted. Despite comments from the Superintendent asking the Pierce principal not to interrupt, he continued. Even a school board member asked him . . . to [please] stop interrupting.

> After the meeting all of the parents of the high school basketball players felt that they were treated rudely and even insulted by the Pierce Principal. The Board members were extremely upset by the Pierce Principal's behavior.

> The issue was never over the opinions expressed in favor of the braids, rather it was all about the manner in which the Pierce Principal conducted himself.

> This was another perfect example of the larger issue where the Pierce Principal's only method of dealing with those who disagreed with him was through verbal attack and combativeness.

(Def.'s Ex. 3–K.)

**(3)**   ***Shooting Threat Incident***

On November 3, 2004, Jodi J. Dillingham, a Pierce Middle School teacher, sent Plaintiff

an email attaching two memos documenting an incident that occurred on November 2, 2004,

involving a student who said that he was going to kill her as well as her students.[4]  (Def.'s Ex.

29.)  Plaintiff subsequently responded to other issues (i.e., the practice of double caroling and

---

[3]The Court is unable to determine from the record who wrote this report.  However, the Court notes that Plaintiff did not object to the accuracy of this report.

[4]Dillingham wrote one memo documenting the behavior of this student and the other memo was written by Arquetta Rosario, a Pierce Middle School teacher, regarding the events of November 2, 2004.  Rosario noted in her memo that the student stated that he "was going to kill every one of us."  (Def.'s Ex. 29.)

16

gang affiliation) discussed in Dillingham's email on November 4, 2004, but he did not address the shooting threat posed by the student.  (*Id*.)

Nancy Mezo, a clerical union representative sent Gale F. Guyer, Director of Personnel, an email on November 9, 2004:

> I have received several inquiries regarding a student at Pierce. Supposedly, he told a teacher that he would shoot her. When employees approached an administrator, they were told they were handling the problem and probably, the student would be expelled.
>
> Teachers, clerical staff, and some students feel that he was not making an idle threat. They feel he is a walking time bomb. They do not feel safe with the student in the building.
>
> They would like to know what is being done to [e]nsure their safety.

(Def.'s Ex. 29.)

That same day, Guyer sent an email to Plaintiff asking about the threat saying "I just received this email from the clerical union.  Can you tell me anything about this?" to which Plaintiff responded "No."  (*Id*.)  At 5:05 a.m., the next morning, on November 10, 2004, Plaintiff modified his response and emailed Guyer stating:  "What I meant to say was I am not sure what they *exactly* are referring to, anyone who has ever talked to me about [this student] always got very long and detailed answers to what we were doing with the student."  (*Id.*) (Emphasis in Original.)  Plaintiff went on to state: "I am dismayed that they didn't come through it (the open door) with this concern.  As I mentioned above anyone who has and does avail himself/herself of our 'open door policy' gets 'very long and detailed answers.'"  (*Id*.)  He further stated that "Nancy and you, may want to encourage them to use the 'open door' policy instead of the 'back door' policy."  (*Id.*)

Guyer passed the series of emails onto Dr. Lux who sent an email to Plaintiff on

November 10, 2004, saying:

> I want to know whether this [student] has said something about harming a teacher or a group of teachers or any staff. You state that some staff members have asked you about him and you gave them long and detailed answers. I would like a brief version of those answers.

> I do not like the fact that you did not respond to Mr. Guyer's implied inquiry which was to find out if any such threat or threats were made. Yes, you might be upset that someone may not have asked you directly about these supposed threats but instead went to their union, but then again it might have been someone who you already talked to and still felt threatened and still has a right to go to their union rep. Gale Guyer also has the right to inquire about whether there has been a threat by a student to shoot a staff member. A better response would have been for you to explain what happened regarding whether there was a threat or not and how it was handled so that we know how to respond to such statements. When it comes to rumors about somebody shooting someone I want the facts regardless of whether someone used the back door to inform us about it or not.

(Def.'s Ex. 29.)  Plaintiff responded to Dr. Lux's email on November 10, 2004:

> I did respond to Mr. Guyer. His question was, "Can you tell me anything about this?" . . . I answered his question. If he wanted more he should have asked specifically instead of implying, then it would have been clear.

> I expect you [to] stop the dysfunctional communication system that still exists and existed in great amounts prior to my coming to this school and over the past two years, that practice has lead to considerable amount of pain, wasted time and wasted energy. And this practice of going around instead of through, can only exist with your complicity.

(*Id*.)

On November 22, 2004, Dr. Lux issued Plaintiff the following written reprimand

regarding this incident:

> On Tuesday, November 16, 2004, we met to discuss the exchange of emails among you, Mr. Guyer and myself over the time period of November 9 though November 11, 2004 regarding questions raised about the statement that a Pierce student supposedly made to shoot a staff, or staff members, at Clifford Pierce Middle School.

> After considering our discussion and reviewing the documentation of all the

emails among the three of us, along with additional emails and documents from staff members related to this situation, most of which were voluntarily provided by yourself, I have made the following judgments.

First, you deliberately withheld information related to Mr. Guyer's inquiry under the guise of saying that the questions were not specific enough and because you felt that any clerical concerns about this matter should have been directed to you first. You were therefore insubordinate in providing pertinent and specific information to Mr. Guyer in response to his asking you if you could tell him anything about the shooting threats attributed to the Pierce student. A simple explanation of what the student did and the action taken was all that was needed to respond properly to Mr. Guyer.

Second, your email responses to me following my inquiry about the situation included the following: you made the accusation that the dysfunctional communication in this school system would not be possible without my complicity; in another email you made the statement that I want you to kowtow to rumor mongers; you sent copies of these comments in your emails to Mr. Guyer. I have found these comments to be inappropriate and disrespectful to my position and to me personally. This manner of communication is absolutely unacceptable and intolerable.

You are hereby reprimanded for failing to respond with pertinent information as requested by a central office administrator and for communicating in an inappropriate and disrespectful manner with the Superintendent and including these statements in other communications to another administrator. You are directed to communicate pertinent information when requested to do so by a central office administrator and without negative and critical comment. You are also directed to conduct yourself in a respectful manner when communicating with your administrative superiors.

Failure to follow these directives will result in further disciplinary actions, including possible termination of your continued employment.

(Def.'s Ex. 31.)

**(4)    *Mailbox Incident***

On November 17, 2004, Plaintiff directed several of Pierce Middle School's industrial

technology teachers to go to his home during a professional development in-service to repair his

mailbox and advised them that they could make up the in-service at another time.  (Def.'s Ex.

33.)  In an email to Dr. Lux on November 18, 2004, Plaintiff wrote:

> I asked [the industrial technology teachers] to go [during in-service hours], because it was a mutually convenient time and they had the opportunity to spend the amount of time meeting as a group at an alternative time. They suggested that this particular time, was not the best time. I told them that it was okay to go now, because they could replace the time, during some of their own choice time, during non-assigned school hours.
>
> I am at fault. I accept the responsibility. They were only following my directive. They have no history of being unprofessional, tardy, and/or truant from their responsibilities, etc. They were not on this day.
>
> As you know, this was done in a very open manner, had I or they felt that it could have resulted in their harm, none of us would have chosen to do it.
>
> I repeat that they are not at fault and they don't deserve any consequences. They didn't do anything wrong. Had I not directed them to go at that time, they would not have.
>
> It was my choice and if anyone deserves consequences then I do.
>
> I accept whatever consequences come with this error in my judgment.

(*Id.*)

**(5)**   *Math Department Incident*

Plaintiff sent Dr. Lux several emails on November 17, 2004, regarding math achievement

concerns of African-American and other students at Pierce Middle School.  (Def.'s Ex. 37.)   In

one email, Plaintiff stated:

> I know that we disagree on this point, but I continue to believe that I will get no where in MCSC without first showing a position of strength. . . . It remains to be seen whether or not your conciliatory approach will yield anything of real value and if it does, it will be part and parcel to the fact that many know I am willing to struggle for what I know and believe to be right.

(*Id.*)

20

On November 18, 2004, Dr. Lux responded to Plaintiff:

Your plans to meet with the department to work through these issue[s] is right on target. . . . I have not seen any evidence of your accusations . . . and again they are unacceptable to me. And if this is what you mean by a "position of strength", then yes we do disagree greatly.

(*Id.*)  Plaintiff subsequently responded to Dr. Lux stating "I really don't follow you either, but I do have my evidence.  Things will be as things will be."  (*Id.*)

**E.     Non-Renewal of Plaintiff's Principal Contract**

On December 16, 2004, Dr. Lux sent Plaintiff a letter advising him that Defendant was considering "a decision not to renew" his Principal contract.  (Def.'s Ex. 40.)  The reasons Defendant was considering nonrenewal of Plaintiff's contract included:

1.     You received a formal reprimand when you were disrespectful and accusatory toward central office administrators. You accused central office administrators of "dysfunctional communication" and of being fooled by lies and charades of others, including both teachers and parents.

2.     You received a formal reprimand when you were insubordinate to an administrative superior when you deliberately withheld information from Mr. Gale Guyer, a central office administrator.

3.     During a meeting with parents, administrators, and School Board members, you acted inappropriately by interrupting others who were speaking. You failed to respond to my requests . . . to stop interrupting others. When I discussed with you how disappointed the School Board members were with your behavior, you stated that if the School Board members could not recognize the substance of what you were saying, it was because they were focusing only on demeanor and style, and you thought poorly of them in return.

4.     Most importantly, you carried out a serious legal and ethical indiscretion when you directed teachers to provide personal service to your home during school hours when they should have been participating in professional development.

(*Id.*)

21

Plaintiff wrote to Dr. Lux and the School Board on December 21, 2004, regarding the nonrenewal letter stating that the move to not renew his contract "clearly cannot be about my competence." (Def.'s Ex. 41.)   In his letter, Plaintiff acknowledged that he had some disagreements with Dr. Lux:

> I can't help but be cognizant of the fact that I am the only Black person in any position of authority in MCSC and I wonder whether or not that has anything to do with this decision. I realize that being such I bring some different viewpoints to bear in my efforts to provide the corporation with my advice, counsel and best thinking on how to deal with certain situations. I have been made aware that others in the MCSC system have very different viewpoints on how people should be treated, responded to and reacted to. Noting this, as I reflect on the reason why would Dr. Lux and the Board want to non-renew me, I can't help but conclude that this is not an issue of competence but instead this must be an issue of personality.

(*Id.*)  Plaintiff also acknowledged that the mailbox incident represented an "error in judgment" and noted that the teachers involved had not missed any professional staff development and "there [had been] no pattern of these types of actions" on his part.  (*Id.*)

Under Indiana law, Plaintiff had the right to request a private conference with the School Board regarding the nonrenewal of his Principal contract.  (Def.'s Ex. 42.)  In conjunction with this meeting, Dr. Lux provided a lengthy letter on January 10, 2005, detailing the reasons why he was recommending nonrenewal of Plaintiff's Principal's contract. (Def.'s Ex. 43.)  In the letter, Dr. Lux noted:

> What is also disturbing is that I have seen Mr. Joiner many times practice the collaboration and conciliation I have been encouraging when he chooses. But, as he has specifically told me, he then willfully, purposefully, and autonomously chooses when to operate at the other extreme of confrontation, accusation, derogation and public admonishment of other administrators, myself and commonly accepted norms of behavior when he believes that the situation warrants it. After contributing 20 years to this school system preaching, practicing and expecting collaboration, conciliation and mediation, I cannot accept a Merrillville administrator's blatant proclamation in word and deed that he will choose when to reject that philosophy in

22

favor of what he deems as the justified means to accomplish his preferred ends. Especially when that means includes the self-appointed right to rebuke the inquiries and expectations of his administrative superiors and not follow commonly accepted norms regarding the use of staff members for personal service during the school day. This is why I now find such incompatibility in our philosophies and approaches to solving problematic issues to the extent that I cannot allow Mr. Joiner to continue to be in a position to exert his confrontational, combative and accusatory approach in response to being questioned or challenged.

Mr. Joiner's argumentative, accusatory and combative responses almost become a form of intimidation, an effort to imply that if you challenge or question him you will be confronted with argument and combative questioning until you are discouraged from arguing or questioning him again.  I also believe that this is why some staff members still choose to circumvent Mr. Joiner and seek assistance through their unions.

Therefore, I feel I have no choice but to recommend the non-renewal of Mr. Joiner's administrative contract.  He is certainly not incompetent, he has certainly demonstrated good administrative skills at times and he is good with students. But I do not feel that any administrator who makes accusations toward his Superintendent, blatantly misuses staff for personal service, who has made the inappropriate decisions he has made, without ever acknowledging or recognizing the need to change, but blatantly continues to be critical of his Superintendent's efforts and suggestions for change, can possibly be considered compatible with the chemistry and philosophy of the current Merrillville administration.

(*Id.*)

Thereafter, in accordance with statutory requirements, on January 18, 2004, the School

Board voted not to renew Plaintiff's Principal contract.  (Def.'s Ex. 44.)  Plaintiff was advised

that a teaching position would be available; however, he accepted employment with another

school district and tendered his resignation to Dr. Lux on April 14, 2005.  (Def.'s Ex. 45.)


**LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Rule 56(c) of the Federal Rules of Civil Procedure)).  Once the moving party has produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial.  *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997).

In deciding a motion for summary judgment, a court must "review the record in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in that party's favor." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 965 (7th Cir. 1998).   Nevertheless, the nonmovant may not rest upon mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  A genuine issue of material fact is not shown by the mere existence of  "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.  It is well-settled that summary judgment should be granted "only where it is perfectly clear that there is no dispute about either the facts of the controversy or the inferences to be drawn from such facts." *Cent. Nat'l Life Ins. Co. v. Fid. & Deposit Co. of Md.*, 626 F.2d 537, 539 (7th Cir. 1980) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035,

24

1038 (7th Cir. 1993).  "[S]ummary judgment is improper in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent."  *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985) (citing *Kephart v. Inst. of Gas Tech.*, 630 F.2d 1217, 1218 (7th Cir. 1980)).  Finally, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."  *Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 379 (7th Cir. 2000) (quoting *Anderson*, 477 U.S. at 255).

## ANALYSIS

### A.    Race Discrimination Claim

Under Title VII, it shall be unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions**,** or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  In order to prevail on an employment discrimination claim under Title VII, a plaintiff must show that the employer had an intent to discriminate; such a showing may be made directly, or indirectly, through the use of an inferential burden-shifting method.  *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).

In the absence of direct or circumstantial evidence, a plaintiff may show intentional discrimination by establishing a prima facie case under the indirect method of proof established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under that framework, a plaintiff is required to establish a prima facie case of discrimination by

25

showing that:  (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) the employer took an adverse employment action against him; and (4) his employer treated similarly situated individuals outside of the protected class more favorably.  *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004); *see also Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1011 (7th Cir. 2004) (the plaintiff must prove that "the employer treated at least one similarly situated individual outside of his protected class more favorably.").

If the plaintiff establishes a prima facie case of discrimination, the employer must then articulate a legitimate, nondiscriminatory reason for its employment decision.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Once the employer sets forth a legitimate reason for its employment decision, the burden shifts back to the plaintiff to establish that the employer's proffered reason was pretextual.  *Id.* The burden of persuasion remains at all times with the plaintiff.  *Burdine*, 450 U.S. at 253.[5]

Plaintiff's race discrimination claim must fail because he has not produced evidence from which a reasonable jury could conclude that he has established a prima facie case of discrimination.  Moreover, Plaintiff's claim cannot stand because he has failed to produce evidence from which a reasonable jury could conclude that Defendant's reasons for not renewing his Principal contract were pretextual.

---

[5]In his Complaint, Plaintiff also asserts a race discrimination claim pursuant to 42 U.S.C. § 1981.  (Compl. ¶ 28.)  "The framework governing liability under Title VII also applies to section 1981 claims."  *Paul v. Theda Med. Ctr., Inc.,* 465 F.3d 790, 794 (7th Cir. 2006) (citing *Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998)); *see also Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004) (citing *Williams v. Waste Mgmt. of Ill.,* 361 F.3d 1021, 1028 (7th Cir. 2004)) ("Because we evaluate § 1981 claims under the same rubric as Title VII claims, we need not address them separately.").

**(1)**     ***Prima Facie Case***

The parties dispute the second and fourth elements of the prima face case, namely, whether Plaintiff was meeting Defendant's legitimate expectations, and whether Plaintiff has identified similarly situated employees outside the protected class that Defendant treated more favorably than him.[6]

A plaintiff must normally show that he was meeting his employer's legitimate expectations as part of his prima facie case in an employment discrimination case before an employer is "subjected to a pretext inquiry."  *Peele v. Country Mut. In*s*. Co.,* 288 F.3d 319, 327 (7th Cir. 2002).  There are, however, certain circumstances where such an inquiry is more appropriately postponed until after an employer has articulated its legitimate, non-discriminatory reasons, and considered together with the issue of pretext:

> [I]n limited circumstances, a plaintiff may be able to meet the second part of the prima facie case without showing that he met his employer's legitimate expectations. As . . . explained in *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1404 (7th Cir. 1996), an individual who meets the other criteria for a prima facie case and also demonstrates that the employer's legitimate expectations were themselves pretextual can survive the first prong of *McDonnell Douglas*.  Under those circumstances, the prima facie case is subsumed into one of establishing pretext under *McDonnell Douglas's* third prong. We have also considered this merger analysis appropriate in cases where the reason for the employer's termination was alleged to be a sham designed to hide the employer's discriminatory purpose.

*Brummett v. Lee Enters., Inc*., 284 F.3d 742, 745 (7th Cir. 2002).  *See also Hague v. Thompson Distribution Co.,* 436 F.3d 816, 823 (7th Cir. 2006) (stating that "if the plaintiffs argue that they have performed satisfactorily and the employer is lying about the business expectations required

---

[6]The first and third elements of the prima facie case are not at issue in this case.  The parties do not dispute that Plaintiff is a member of a protected class because he is African-American and that he suffered an adverse employment action when his Principal contract was not renewed by Defendant.  (Def.'s Br. Supp. Mot. Summ. J. at 28, Pl.'s Resp. Opp'n Mot. Summ J. at 22.)

for the position, the second prong and the pretext question seemingly merge because the issue is the same–whether the employer is lying."); *see also Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997) ("The defendant's expectations are not legitimate if they are phony; so if they are argued to be phony, the issue of legitimate expectations and the issue of pretext seem to merge.").

Accordingly, because the second element of the prima facie case is closely intertwined with the pretext analysis, the Court will consider them together, keeping in mind that if Plaintiff does not present sufficient evidence of pretext, he also does not show that he was meeting his employer's legitimate expectations. *Hague*, 436 F.3d at 823.

Returning to the prima facie case, Plaintiff cannot prevail against Defendant's motion for summary judgment because he cannot show that Defendant treated similarly situated employees more favorably than him. A similarly situated employee is one that is "directly comparable in all material respects." *Jordan v. City of Gary*, 396 F.3d 825, 835 (7th Cir. 2005) (quoting *Hudson v. Chicago Transit Auth*., 375 F.3d 552, 561 (7th Cir. 2004)). To determine whether employees are similarly situated, "a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000).

> [I]n disciplinary cases—in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason—a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. . . . This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

*Id*. at 617–18. Employees must hold the same or equivalent positions in order to be similarly situated. *Hoffman–Dombrowski v. Arlington Int'l Racecourse, Inc*., 254 F.3d 644, 651 (7th Cir.

2001).  Ordinarily it will not be the case that a plaintiff is similarly situated to another employee

when the plaintiff is subordinate to that employee.  *Patterson v. Avery Dennison Corp.*, 281 F.3d

676, 680 (7th Cir. 2002).  Furthermore, a plaintiff must establish that similarly situated

employees were treated more favorably by the employer at the time of the alleged

discrimination.  *Jordan*, 396 F.3d at 834.

Plaintiff identifies five individuals he believes were similarly situated and received better

treatment by Defendant.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 26–28.)  Plaintiff first claims that

Mark Sperling, the Principal of Merrillville High School, was similarly situated because, like

Plaintiff, he was employed as a principal and reported to Dr. Lux (and ultimately the School

Board).  Plaintiff asserts that, as administrators, they were both subject to a teacher's contract

and were required to follow the same standards and procedures.  (*Id.* at 27.)

Plaintiff argues, however, that Sperling was not terminated even though he interrupted,

shouted, and walked out of the November 8, 2004 meeting where the issue of Pierce Middle

School basketball players wearing their hair in braids was discussed with parents, school

administrators, school coaches, and School Board members.  (Pl.'s Resp. Opp'n Mot. Summ. J.

at 26.)  Plaintiff points out that in Dr. Lux's December 16, 2004, letter, one of the reasons for

Plaintiff's termination was that he acted inappropriately during the meeting "by interrupting

others who were speaking" and "failed to respond to [Dr. Lux's] requests . . . to stop interrupting

others."  (Def.'s Ex. 40.)

Plaintiff has failed to established that Sperling was similarly situated to him.  Plaintiff has

produced no evidence that Sperling was similarly situated with respect to "performance,

qualifications and conduct" because there is no evidence in the record establishing that Sperling

29

had a similar disciplinary background or engaged in the same type of conduct as Plaintiff while working for Defendant. *Radue*, 219 F.3d at 617. In order for Plaintiff to show that he was similarly situated to Sperling, he must show that Sperling engaged in similar conduct without "such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 546 (7th Cir. 2002). Yet, Plaintiff has failed to show that Sperling is "directly comparable in all material respects," *Jordan*, 396 F.3d at 835, because he cannot establish that Sperling had a "comparable set of failings." *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 530 (7th Cir. 2003); *see also Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) ("[W]e have cautioned that, in order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a 'comparable set of failings.'").

Plaintiff next points out that, while Defendant alleges that the School Board believed Plaintiff's actions during the November 8, 2004 meeting were inappropriate, the evidence shows that Donna Stath, a School Board member, also acted inappropriately during the meeting. (Pl.'s Resp. Opp'n Mot. Summ. J. at 27.) In fact, Plaintiff points out that one parent of a seventh-grade basketball player who attended the meeting told a local newspaper that Stath "talked down to [Plaintiff]," the School Board exhibited "attitude and frustration" during the meeting, and the School Board was "offensive and hostile" towards Plaintiff. (*Id*., Pl.'s Ex. D.) Plaintiff further asserts that he was interrupted by Stath and she made sarcastic comments regarding educators during the meeting. (*Id.*)

With regard to Stath, Plaintiff cannot be viewed as being similarly situated to her because she was a School Board member (an elected position); therefore, they did not hold the same or

30

equivalent positions and were not subject to the same standards.  *Radue*, 219 F.3d at 618;

*Hoffman–Dombrowski,* 254 F.3d at 651.  Accordingly, Plaintiff cannot establish that Stath was

similarly situated because she was his superior.  *Patterson*, 281 F.3d at 689.

Next, Plaintiff asserts that Defendant contends that the most important reason that he was

terminated was because he "carried out a serious legal and ethical indiscretion when [he]

directed teachers to provide personal service to [his] home during school hours when they should

have been participating in professional development."  (Pl.'s Resp. Opp'n Mot. Summ. J. at 27.)

Plaintiff claims, however, that he has identified two Caucasian teachers who engaged in serious

legal and ethical indiscretions but they were neither disciplined nor terminated.  (*Id*. at 14–15,

27–28.)   First, Plaintiff identifies one Caucasian teacher who posted a pornographic picture on a

Merrillville High School website in December 2004.  (*Id*. at 28.)  This teacher, however, was not

disciplined.  (*Id*.)  Likewise, Plaintiff identifies another Caucasian teacher who falsified official

student data in Spring 2004; this teacher was also not disciplined.  (*Id*.)  Plaintiff claims that

these teachers were similarly situated to him because they reported to Dr. Lux (and ultimately

the School Board) and their employment was also subject to a teacher's contract.  (*Id*.)

Plaintiff cannot establish that the two Caucasian teachers he identifies were similarly

situated to him.  They were not similarly situated because they did not hold the same or

equivalent positions and were not subject to the same standards because they were teachers, not

principals, and they were in subordinate positions.  *Radue*, 219 F.3d at 618; *Hoffman-

Dombrowski*, 254 F.3d at 651;  *Patterson*, 281 F.3d at 689.  In addition, Plaintiff was not

similarly situated because teachers were subject to a collective bargaining agreement whereas

Plaintiff, in his Principal position, was not subject to this type of an agreement.

31

Lastly, Plaintiff claims that Dr. Lux was treated more favorably than him because each year Dr. Lux had a back-to-school party where Defendant's maintenance workers helped set up school tables and chairs at Dr. Lux's home during school hours.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 33–34.)  Dr. Lux, however, was neither disciplined nor terminated for this activity.  (*Id.*)  Dr. Lux was not similarly situated to Plaintiff because he was the Superintendent and a superior to Plaintiff.  *See e.g., Radue*, 219 F.3d at 618; *Hoffman–Dombrowski*, 254 F.3d at 651; *Patterson*, 281 F.3d at 689.  Importantly, the back-to-school party was an annual event which School Board members attended and implicitly approved of each year.  (Lux Dep. at 82:12-83:22.)

The Court finds that Plaintiff has failed to identify at least one similarly situated school administrator or employee who was treated more favorably than him.[7]

**(2)**     ***Pretext***

Plaintiff cannot prevail against Defendant's motion for summary judgment because he cannot show that Defendant's reasons for not renewing his Principal contract were a pretext for discriminating against him on the basis of his race.  "Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action.'"  *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996) (quoting *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)).  "The pretext inquiry focuses on the honesty—not the accuracy—of the employer's stated reason for the termination."  *Tincher v. Wal–Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997) (citation omitted).  In order to show pretext, "a plaintiff must offer evidence to indicate that the employer did not honestly believe the reasons it gave for its action

---

[7]To the extent Plaintiff makes general allegations that there were other employees who were similarly situated, he has failed to produce evidence establishing this element of the prima facie case.  (*See* Pl.'s Resp. Opp'n Mot. Summ. J. at 18, Def.'s Br. Supp. Mot. Summ J. at 31.)

and is simply lying to 'cover [its] tracks.'" *McCoy v. Maytag Corp.*, 495 F.3d 515, 522–23 (7th Cir. 2007) (quoting *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005)).

"The mere fact that the employer acted incorrectly or undesirably, however, cannot adequately demonstrate pretext; rather, the employee must prove that the employer did not honestly believe the reasons it gave for the firing." *Tincher,* 118 F.3d at 1130 (citing *Wolf*, 77 F.3d at 919); *see also Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997) ("The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual."); *Timm v. Mead Corp.,* 32 F.3d 273, 275 (7th Cir. 1994) (the proffered reason "need not be a good or sympathetic justification for what the employer did; it need only be nondiscriminatory and, if true, (even if shortsighted or ultimately a product of poor business judgment) merely explain why the challenged action was taken.").  A plaintiff may establish pretext by "introducing evidence that demonstrates that (1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the discharge; or (3) the proffered reasons were insufficient to motivate the discharge." *Wolf*, 77 F.3d at 919.

Plaintiff initially appears to concede that the reasons stated by Dr. Lux in his December 16, 2004, letter are, in fact, legitimate, nondiscriminatory reasons for his termination.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 29.)  Plaintiff argues, however, that he has produced evidence that calls into question Defendant's proffered reasons for his termination. (*Id.*) Plaintiff asserts that he has produced (1) evidence regarding racial tension and animosity on the part of Defendant and the surrounding community; (2) evidence that Defendant engaged in a pattern and practice of disparate treatment against African-American administrators; (3) evidence that tends to show

33

that Defendant's proffered reasons for his termination were insufficient to motivate the

nonrenewal of his Principal contract; and (4) evidence that Defendant's attack on Plaintiff's

overall performance is a post hoc attempt to fend off this litigation.  (*Id.* at 29–34.)


(a)     *Racial Tension or Discomfort*

Plaintiff first asserts that he has produced evidence which shows that Defendant is a

school district "wrought with racial diversity issues" that "existed before [he] arrived at Pierce

[Middle School] and [which] got progressively worse."  (Pl.'s Resp. Opp'n Mot. Summ. J. at

29–30.)   Plaintiff cites to Indiana Department of Education statistical evidence which shows that

for the 2004–05 school year, African-American students accounted for 42.5% of all students in

Defendant's school system.  (*Id.*, Pl.'s Ex. E.)  Plaintiff contends, however, that despite the fact

that African-American students constituted 42.5% of the students in February 2005, only 14% of

Pierce Middle School's staff were African-American which establishes that Defendant refused to

hire and promote African-American teachers and staff members.  (*Id*. at 30.)

Next, Plaintiff points out that he was the first African-American Principal hired by

Defendant, that no African-American has ever held a position as a central office administrator,

and there has never been an African-American School Board member. (Pl.'s Resp. Opp'n Mot.

Summ. J. at 15.)  He further avers that prior to the termination of his Principal contract, the

School Board had an opportunity to appoint an African-American School Board member but

failed to do so.  (*Id*.)

Plaintiff further relies on the Affidavit of Dr. John Leeke, an independent

mediator/facilitator, to establish that racial tension and racial discomfort were prevalent among

Defendant's administrators, teachers, and staff.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 30–31.)

Plaintiff points out that Leeke concluded that Defendant needed to undergo intensive training

dealing with diversity and racial issues.  (*Id*. at 16–17.)  In his Affidavit, Leeke states:

> In order to research the underlying cause of the tension, I interviewed a number of people in various positions at Pierce.
>
> As a result of my research, observations and work with several critical school committees over several months I determined that there was a very small group of Caucasian teachers at Pierce who had, in effect, been in de facto control of the school under the previous principal.
>
> These teachers were uncomfortable with a strong, African American man in a position of authority.
>
> A significant factor in this discomfort was the fact that, to my knowledge, prior to [Plaintiff] becoming [P]rincipal of Pierce Middle School, there had never been an African American man in any position of authority in the Merrillville Community School Corporation.
>
> This "discomfort" with African Americans in positions of authority was not confined to the staff at Pierce Middle School.  Based on my observations and work within the Merrillville Community School Corporation, I observed that this racial "discomfort" was also present to varying degrees in many of the Caucasian employees of MCSC, including Dr. Tony Lux and members of the school board.

(Leeke Aff. ¶¶ 6–10.)  Plaintiff asserts that, despite Leeke's suggestions, Defendant failed to

provide diversity training for the Pierce Middle School staff.  (Pl.'s Resp. Opp'n Mot. Summ. J.

at 17.)

Plaintiff also claims, as articulated in various newspaper articles, that parents and

community members believed Defendant's leadership lacked diversity.  (Pl.'s Resp. Opp'n Mot.

Summ. J. at 31, Pl.'s Ex. D.)  Plaintiff points out that Sue Sayers, a teacher who taught at Pierce

Middle School for forty years, told a local newspaper that diversity was a challenge at Pierce.

(*Id.* at 16, Pl.'s Ex. D.)  Plaintiff states that some parents contend that racial tension was behind

the decision not to renew his Principal contract.  (*Id*. at 31, Pl.'s Ex. D.)

Plaintiff asserts that the statement Dr. Lux made regarding the issue of whether Pierce Middle School basketball players should be permitted to wear hair braids shows that there are racial conflicts at Pierce Middle School and throughout Defendant's school system.[8]  (Pl.'s Resp. Opp'n Mot. Summ. J. at 31.)  Plaintiff alleges that Dr. Lux said:

> People have come so far when it comes to issues of diversity. But they see Merrillville in terms of the fact that so many of the people from their families got pushed out of Gary. And they're just afraid of going down that slippery slope of Merrillville becoming a ghetto school.

(Joiner Dep. at 166:10–17, Pl.'s Resp. Opp'n Mot. Summ. J. at 31.)  Accordingly, Plaintiff argues that on the basis of the evidence of Defendant's racial discomfort, along with the existing racial diversity issues, a reasonable fact finder could determine that Defendant's proffered reasons for not renewing his Principal contract were pretextual.  (*Id*.)

The Court disagrees with Plaintiff and finds that the race statistics, Leeke's Affidavit statements, Dr. Lux's alleged statement, and various newspaper articles regarding racial tension and diversity problems within Defendant's school system fail to establish that Defendant's reasons for not renewing Plaintiff's Principal contract were a pretext for discrimination.  Rather, the Court finds that this evidence is irrelevant because it does not show intentional race discrimination as to Plaintiff.  While these submissions may imply that there have been racial tensions and issues related to racial diversity within Defendant's school system and surrounding community, they do not establish or prove that Defendant intentionally discriminated against

---

[8]Plaintiff points out that, in October 2004, Dr. Lux gave a speech to an organization called the Northwest Indiana Racial Relations and, in essence, stated that there has been and continues to be mistreatment and prejudice toward others because they are different and because of inaccurate generalizations both generally and in the Merrillville community.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 17, Lux Dep. at 69:20-70:8.)

Plaintiff on the basis of his race in deciding not to renew his Principal contract.  In addition, the Court is mindful that Dr. Lux recommended to the School Board that Plaintiff be hired as Principal of Pierce Middle School.  The Court is unable to draw any reasonable inferences from this evidence that Defendant's proffered reasons for not renewing Plaintiff's Principal contract were a pretext for race discrimination.

(b)      *Pattern and Practice*

Next, Plaintiff alleges that he has produced evidence that Defendant engaged in a pattern and practice of disparate treatment against African-American administrators.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 31.)  Plaintiff asserts that before he began working for Defendant there were only three African-American Assistant Principals.  (*Id.*)  He points out that, Stephanie Winborn, one African-American Assistant Principal, told a local newspaper that she elected to leave Defendant's employment to take another Principal position because she suspected racial bias was behind her lack of advancement with Defendant.  (*Id.*, Pl.'s Ex. D.)  Winborn, who was first employed as a teacher and then promoted to Assistant Principal, was passed over for Principal positions on two occasions.  (Winborn Aff. ¶¶ 3, 4, 7, 9.)

With respect to the first open Principal position, Winborn stated that Defendant told her that she did not get the position because a Caucasian male who was selected had more experience.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 31, Winborn Aff. ¶ 5.)   Regarding the second open Principal position, Winborn stated that Defendant hired a Caucasian female teacher who had no formal administrative experience.  (*Id.* ¶ 10, Def.'s Ex. D.)  When Winborn inquired as to why she was not chosen, she stated that Dr. Lux told her she was not selected "because the staff

[would] not accept [her]" and she would not have been happy.  (*Id*. ¶ 12, Def.'s Ex. D.)  Winborn also believed Defendant's decision not to renew Plaintiff's Principal contract followed a pattern of unfair consideration with respect to minorities.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 32, Def.'s Ex. D.)

Plaintiff also points out that Gwen Adell, another Assistant Principal, who recounted her experience working for Defendant in a local newspaper, sought new employment because she thought that less qualified candidates were promoted over African-American candidates.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 32, Def.'s Ex. D.)  Adell was quoted in the newspaper as stating that working for Defendant "was like walking back into the 1960s – no, the 1950s."  (*Id*., Def.'s Ex. D.)  Adell also reported that, while working for Defendant, she remembers that teachers called minority students "a bunch of hoodlums from Gary" and racial epithets were used by teachers.  (*Id*.)  Adell, however, credited "[Dr.] Lux with intervening and warning teachers that racist comments could lead to firing."  (Def.'s Ex. D.)

Furthermore, in asserting that Defendant engaged in a pattern and practice of disparate treatment against African-American administrators, Plaintiff relies on Leeke's professional opinion and experience in dealing with racial issues in organizations:

> "In short, it is my professional opinion, based on my experience in dealing with racial issues in an organizational context, that race – and specifically the discomfort of Dr. Lux, the school board and other administrators – was a significant motivating factor in the decision not to renew [Plaintiff's] contract."

(Leeke Aff. ¶ 16, Pl.'s Resp. Opp'n Mot. Summ. J. at 32.)

The Court disagrees with Plaintiff and finds that evidence he proffers fails to establish that Defendant engaged in a pattern and practice of discriminating against African-American administrators.  The Court finds that this evidence is irrelevant in establishing that Defendant's

reasons for not renewing his Principal contract were, in fact, a pretext for race discrimination. Rather, the evidence constitutes the subjective opinions of two of Defendant's former Assistant Principals as to why they were passed over for promotions.  Their opinions that they were not promoted because they are African-American are irrelevant in establishing that Defendant intentionally discriminated against Plaintiff on the basis of his race.  Accordingly, this evidence fails to establish that Defendant's reasons for not renewing Plaintiff's Principal contract were pretextual.

(c)      *Insufficient Reasons*

Plaintiff alleges that he has produced evidence which establishes that Defendant's reasons for not renewing his Principal contract were insufficient to actually motivate the termination of his contract.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 6–15, 32–34.)  First, Plaintiff states that Defendant claims it decided not to renew his Principal contract because he interrupted others during the November 8, 2004 meeting.  (*Id*. at 32.)  Plaintiff states that he has produced evidence that Sperling, the Principal of Merrillville High School, shouted and interrupted others during the meeting, slammed his hands on a table, and stormed out of the meeting, however, he was not disciplined or terminated.  (*Id.* at 32–33.)  Plaintiff also claims that others interrupted during the meeting.  For example, Stath, a School Board member, made sarcastic comments regarding educators, and one parent observed that the School Board "talked down to [Plaintiff]" and that the School Board was "offensive and hostile" towards Plaintiff.  (*Id.* at 13, Pl.'s Ex. D.)

Next, Plaintiff avers that Defendant made its decision not to renew Plaintiff's contract because he committed a "serious legal and ethical indiscretion" when he directed industrial

technology teachers to fix a mailbox at his home during school hours.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 33.)  Plaintiff asserts, however, that he has produced evidence that other teachers committed far worse legal and ethical indiscretions and were neither disciplined nor terminated. (*Id.*)  Plaintiff points out that one Caucasian teacher, who posted a pornographic picture on a Merrillville High School website in December 2004, was not disciplined or terminated. (*Id.*)  Plaintiff also identified another Caucasian teacher who falsified official student data, however, that teacher was not disciplined or terminated.  (*Id.*)  Plaintiff further points out that he has produced evidence that for the last twenty-three years, Dr. Lux has hosted a back-to-school party where Defendant's maintenance workers set up school tables and chairs at his home, however, he also was not disciplined or terminated.  (*Id.*)

Plaintiff further contends that Defendant asserts that its decision not to renew Plaintiff's contract was also premised on his "deliberately withh[olding] information" from Gale Guyer, Director of Personnel, regarding the incident where a student threatened to kill a teacher and her students.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 33.)  Plaintiff asserts, however, that he did not deliberately withhold information because he "believed that Guyer was inquiring about the comments made to staff members by administrators and not the substance of [the student's] alleged threats."  (*Id.* at 8.)  Plaintiff states that after thinking about it, however, he decided to write Guyer another email clarifying his earlier email: "What I meant to say was I am not sure what they *exactly* are referring to, anyone who has ever talked to me about [this student] always got very long and detailed answers to what we were doing with the student."  (*Id.*, Def.'s Ex. 29.) Plaintiff claims that it is clear from his emails to staff in the days before Guyer's email and his attempt to clarify his response to Guyer that he did not purposely withhold information from

40

anyone.  (*Id*. at 8.)  Accordingly, Plaintiff asserts that this reason was insufficient to motivate nonrenewal of his contract because it was clear from Guyer's response that he was satisfied with Plaintiff's response and Guyer did not believe that Plaintiff's responses evidenced insubordination.  (*Id*. at 33.)

Plaintiff further asserts that in direct contradiction of Guyer's email, Dr. Lux sent Plaintiff email accusing him of failing to respond to Guyer's implied inquiries regarding the student's threats.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 8.)  Plaintiff responded to Dr. Lux stating that "[h]e did respond to Mr. Guyer" and that, if Guyer wanted more information, "he should have asked specifically instead of implying, then it would have been clear."  (*Id.* at 8–9, Def.'s Ex. 29.)   In his email, Plaintiff further told Dr. Lux that he expected him to "stop the dysfunctional communication system that still exists and existed in great amounts prior to [his] coming to th[e] school and over the past two years."  (*Id.* at 9, Def.'s Ex. 29.)  Plaintiff states that in his November 22, 2004, written reprimand regarding this incident, Dr. Lux states that Plaintiff's response was "inappropriate and disrespectful to [his] position and to [him] personally" and his "manner of communication [was] absolutely unacceptable and intolerable." (*Id*., Def.'s Ex. 31.)  Plaintiff claims, however, that he had discussed the communication problems at Pierce Middle School with Dr. Lux who agreed there was poor communication between staff members, and Leeke had also concluded that staff members engaged in "dysfunctional communication."  (*Id*.)   Plaintiff therefore asserts that this reason was insufficient to warrant nonrenewal of his contract because the communication problems were documented by the results of a climate audit.  (*Id.*)

While Plaintiff attempts to provide this Court with a long dissertation trying to justify his

actions and complain that others, who engaged in what he believes to be similar behavior received preferable treatment from Defendant, he does not dispute any of the facts underlying Defendant's four reasons for not renewing his Principal contract.  For example, with regard to the November 8, 2004 meeting, Plaintiff admitted that he interrupted others during the meeting. (Joiner Dep. at 177:3-4.)  Plaintiff also admitted in a November 18, 2004, email to Dr. Lux that he had asked teachers to go to his home during in-service hours to fix his mailbox.  (Def.'s Ex. 33.)  In the email, Plaintiff stated that he was "at fault," "accept[ed] . . . responsibility," and the teachers "were only following [his] directive."  (*Id.*)  He further told Dr. Lux that "Had I not directed them to go at that time, they would not have" and "I accept whatever consequences come with this error in judgment."  (*Id.*).

Regarding the incident where a student threatened to kill a teacher and her students, the record establishes that Plaintiff did, in fact, withhold information from Guyer.  (Def.'s Ex. 29.) On November 3, 2004, Dillingham, a Pierce Middle School teacher, sent Plaintiff email attaching two memos which documented that, on November 2, 2004, a student threatened to kill her as well as her students.  (*Id.*)  When Guyer asked Plaintiff, on November 9, 2004, if he could tell him anything about the incident, he responded "No" even though Dillingham had informed him of this incident about one week earlier.  (*Id.*)  The fact that Plaintiff sent Guyer a subsequent email attempting to clarify his negative response stating that he was not sure "*exactly*" what Guyer or the clerical union were referring to establishes that he knew he had not provided an appropriate response in the first instance.  His attempt to explain or justify his initial negative response to Guyer regarding this incident is of no avail.  Furthermore, the record establishes that Plaintiff told Dr. Lux that he expected him to stop the "dysfunctional communication" and it is

42

clear that the manner in which he communicated with Dr. Lux was, in fact, "inappropriate and disrespectful to [his] position and to [him] personally." (Def.'s Ex. 31.) Accordingly, the record establishes that Defendant's reasons for not renewing Plaintiff's Principal contract were sufficient and not a pretext for race discrimination because they do not constitute lies or phony reasons for Defendant's action. *See Wolf*, 77 F.3d at 919; *see also Gorence v. Eagle Food Centers, Inc.,* 242 F.3d 759, 763 (7th Cir. 2001) ("[I]t is simply not true, . . . that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence of discriminatory intent. They do not; zero plus zero is zero.").

Even if Defendant was mistaken in its reasons for not renewing Plaintiff's Principal contract, the only relevant question for the Court is whether Defendant honestly believed its reasons for its action in not renewing his contract. *McCoy*, 495 F.3d at 522–23. As stated, Plaintiff has failed to present any evidence that Defendant lied about the reasons for its actions as his conduct is well-documented in various emails and letters. Nor has Plaintiff presented any evidence that Defendant's decision was motivated by any discriminatory animus. In fact, there is no evidence that Defendant did not honestly believe its proffered reasons for not renewing Plaintiff's Principal contract. The pretext inquiry does not focus on the wisdom of the decision but only on whether the actors acted honestly and without discriminatory motivation: "We do not ask whether the reason for the employment action was 'a correct business judgment but whether the decisionmakers honestly acted on that reason.'" *Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 541 (7th Cir. 1998). If at least one reason for Defendant's action stands unquestioned, summary judgment is proper. *Walker v. Glickman*, 241 F.3d 884, 890 (7th Cir. 2001). Herein, the mailbox incident itself is enough to justify Defendant's decision not to

renew Plaintiff's Principal contract.

In a Title VII case, it is irrelevant that Plaintiff found Dr. Lux's conciliatory approach inappropriate or that he accomplished some positive things while working as the Principal of Pierce Middle School. Rather, the relevant consideration is whether Defendant reasonably believed that Plaintiff was combative, inappropriate in his remarks, and insubordinate. The Court finds that the evidence establishes that Defendant made its decision not to renew Plaintiff's Principal contract on the basis of its honest belief that Plaintiff repeatedly acted inappropriately.

Plaintiff "must do more than challenge the judgment of his superiors through his own self-interested assertions. . . . '[The employee's] perception of himself . . . is not relevant. It is the perception of the decision maker which is relevant.'" *Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989) (citations omitted). The Seventh Circuit has stated:

> [W]e do 'not sit as a super-personnel department that reexamines an entity's business decisions.' *Dale*, 797 F.2d at 464. 'No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII and § 1981 do] not interfere.' *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir. 1987). Rather, our inquiry is limited to 'whether the employer gave an honest explanation of its behavior.'

*Id.* at 429; *see also Ajayi v. Aramark Bus. Servs., Inc.,* 336 F.3d 520, 532 (7th Cir. 2003) ("Above all, we are mindful that courts do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions.").

This Court will not second guess Dr. Lux and the School Board's legitimate business reasons and will not assume the role of a super-personnel department. As discussed, the evidence before the Court does not suggest a pretext for discrimination.

Finally, relative to the pretext for race discrimination issue, Plaintiff has presented no

44

evidence to contradict the "common actor" presumption of non-discrimination that applies in this case.  Under Seventh Circuit case law, "when an employee is hired and fired by the same decision-maker in a relatively short time span, a presumption, or inference, of nondiscrimination arises."  *Chiaramonte v. Fashion Bed Group*, *Inc.*, 129 F.3d 391, 399 (7th Cir. 1997); *see also Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 747 (7th Cir. 2002) ("When the same person hires and later fires the employee who claims that his firing was discriminatory, judges are skeptical, because why would someone who disliked whites, or Germans, or members of some other group to be working for him have hired such a person in the first place?").  In *Chiarmonte*, the decision-maker hired the plaintiff when he was 52 years old, retained him after a merger, and two years later fired him.  The Seventh Circuit, in holding that the common actor presumption applied, noted "[i]t is highly doubtful that a person who hires an employee in the protected age group, . . . would fire that same employee . . . as a result of a sudden 'aversion to older people.'" *Id.* (quoting *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 175 (8th Cir. 1992)).

Here, Dr. Lux made the decision to recommend that Plaintiff, who is African-American, be hired as Pierce Middle School's Principal. (Def.'s Ex. 3-B.)  Less than three years later, Dr. Lux recommended that Plaintiff's Principal contract not be renewed and the School Board ultimately voted not to renew his contract.  (Def.'s Exs. 40, 42, 44.)  A presumption of nondiscrimination arises from the facts in this case because it is highly unlikely that Dr. Lux would suddenly develop an aversion to African-Americans.  Plaintiff has presented no evidence to overcome the common actor presumption, leaving a strong inference that discrimination was not a determining factor for Defendant's decision not to renew Plaintiff's Principal contract.

The Court finds that Defendant has produced legitimate, nondiscriminatory reasons for

its decision not to renew Plaintiff's Principal contract.  Moreover, Plaintiff has failed to offer any evidence which establishes that Defendant's proffered reasons are lies or a pretext for discriminating against him on the basis of his race.  Because Plaintiff has failed to produce evidence of pretext, he has also failed to show that he was meeting his employer's legitimate expectations.

On the basis of the foregoing, when viewing the evidence in the light most favorable to Plaintiff, a fair-minded jury could not return a verdict for him on the evidence presented as it relates to his race discrimination claim.

## B.    Retaliation Claim

Under Title VII, it is unlawful for an employer to "discriminate against" an employee "because he has opposed any practice made an unlawful employment practice [by this statute]," or "because he has made a charge, testified, assisted, or participated in . . . an investigation, proceeding, or hearing [under this statute]."  42 U.S.C. § 2000e-3(a.).  To show that an employer has violated this provision of Title VII, a plaintiff may present either direct or indirect evidence of the employer's retaliatory intent.  *Williams v. Waste Mgmt. of Ill., Inc*., 361 F.3d 1021, 1031 (7th Cir. 2004).

A plaintiff may establish retaliation by presenting direct evidence of "(1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two."  *Williams*, 361 F.3d at 1031 (quoting *Sitar v. Ind. Dep't of Transp*., 344 F.3d 720, 728 (7th Cir. 2003)).  Under the direct method, the Seventh Circuit has accepted circumstantial evidence of intentional retaliation, "the kind that consists of ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of

evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).  If the plaintiff's evidence is "contradicted, the case must be tried unless the defendant presents unrebutted evidence that it would have taken the adverse employment action against the plaintiff anyway, 'in which event the defendant's retaliatory motive, even if unchallenged, was not a but-for cause of the plaintiff's harm.'"  *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003) (citing *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 642 (7th Cir. 2002)).  An indirect retaliation claim is similar to an indirect disparate treatment claim, except that the first element requires evidence of protected activity under Title VII instead of membership in a protected class or group.  *Roney v. Ill. Dep't of Transp.,* 474 F.3d 455, 459 (7th Cir. 2007).

Plaintiff proceeds under the direct method asserting that he is relying on circumstantial evidence to establish retaliation on the part of Defendant. (Pl.'s Resp. Opp'n Mot. Summ. J. at 36.)  Plaintiff argues that while he did not file an Equal Employment Opportunity Commission Charge of Discrimination or any formal written complaint, he still participated in statutorily protected activity because he reasonably believed he was opposing Defendant's unlawful practices.  (*Id.*)  Plaintiff relies, for example, on *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997) to support his assertion that, at a minimum, a plaintiff must show that he had a "reasonable belief" he was challenging conduct prohibited by Title VII.  (*Id.*)

Plaintiff contends that he reasonably believed he was opposing Defendant's unlawful practices because he attempted to promote and protect the rights of African-Americans.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 37, 38.)  For example, in October and November 2004, Plaintiff

47

opposed Defendant's longstanding policy banning hair braids or corn rows from being worn by members of Pierce Middle School's basketball team.  (Def.'s Exs. 26, 27, 40.)  Moreover, Plaintiff asserts that he has produced evidence that Defendant was a school district suffering from racial diversity issues and, in particular, "teachers were uncomfortable with a strong, African American man in a position of authority."  (Leeke Aff. ¶ 8.)  Plaintiff further points out that "racial 'discomfort' was also present to varying degrees in many of the Caucasian employees of MCSC, including Dr. Tony Lux and members of the [S]chool [B]oard."  (*Id.* ¶ 10.)

Plaintiff specifically asserts that Defendant began retaliating against him after the November 8, 2004 meeting where the issue of Pierce Middle School basketball players wearing hair braids was discussed.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 18–19.)  At that time, Plaintiff informed Dr. Lux that if asked, he intended to "avail [himself] of [his] [F]irst [A]mendment rights and speak openly and honestly" about the situation.  (*Id.*, Def.'s Ex. 26.)  Plaintiff further asserts that it was clear that he and the parents of the basketball players considered the prohibition of hair braids to be a racial issue.  (*Id.*, Def.'s Exs. 26–27, Pl.'s Ex. C.)

Plaintiff argues that Defendant does not dispute that he suffered an adverse employment action when his Principal contract was not renewed.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 38.)  Plaintiff contends, however, that he also suffered an adverse employment action when he received a written reprimand from Dr. Lux, on November 22, 2004, regarding the incident where a Pierce Middle School student threatened to shoot a teacher and students, which was just two weeks after the November 8, 2004 meeting.  (*Id.*)

Even assuming *arguendo* that Plaintiff reasonably believed he engaged in protected

activity and was subjected to adverse employment actions by Defendant, he has failed to establish that there was a causal connection between his alleged protected activity and the adverse employment actions.  While Plaintiff argues that there is circumstantial evidence establishing the requisite causal connection, the Court is not persuaded.  Plaintiff first asserts that he received written discipline on November 22, 2004, which was temporally proximate to his participation in the November 8, 2004 meeting.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 19, 38–39.) Plaintiff asserts that the timing of the written discipline is suspicious and constitutes circumstantial evidence of a causal connection between his protected activity and the adverse employment action.  (*Id*.)  The Court disagrees with Plaintiff because the record unequivocally establishes that Plaintiff received a written reprimand on November 22, 2004, because he withheld information related to shooting threats made by a Pierce Middle School student and communicated in an inappropriate and disrespectful manner to Dr. Lux and Guyer.  Accordingly, the November 22, 2004, written reprimand cannot be viewed as retaliatory conduct on the part of Defendant for Plaintiff's participation in any alleged protected activity.

Next, Plaintiff asserts that Dr. Lux made the following statement to him regarding the issue of whether Pierce Middle School basketball players should be permitted to wear hair braids:

> People have come so far when it comes to issues of diversity. But they see Merrillville in terms of the fact that so many of the people from their families got pushed out of Gary. And they're just afraid of going down that slippery slope of Merrillville becoming a ghetto school.

(Pl.'s Resp. Opp'n Mot. Summ. J. at 38, Joiner Dep. at 166:10–17.)  Plaintiff contends that Dr. Lux's statement is ambiguous and constitutes circumstantial evidence of a causal connection. The Court disagrees with Plaintiff and views Dr. Lux's statement as being irrelevant because it

49

does not show intentional retaliation on the part of Defendant as to Plaintiff.  Rather, it is a general statement which does not establish a causal connection between Plaintiff's participation in his alleged protected activity and his November 22, 2004, written reprimand.

Plaintiff further claims that he has produced evidence that Sperling, who was similarly situated to him, interrupted others, slammed his hands on the table, and walked out in the middle of the November 8, 2004 meeting, was treated more favorably by Defendant because he was not disciplined or terminated.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 38–39.)   Plaintiff asserts that evidence of similarly situated employees being treated differently constitutes circumstantial evidence that can be used to establish a causal connection between protected activity and an adverse employment action.  (*Id*. at 39.)  The Court finds Plaintiff's contention unavailing because, as discussed *supra* in this opinion, Sperling was not similarly situated to Plaintiff.

Lastly, Plaintiff argues that he has produced evidence which shows that he did not deserve to be disciplined or terminated and that Defendant's reasons for disciplining and terminating him were a pretext for discrimination.  (Pl.'s Resp. Opp'n Mot. Summ. J. at 39.)  Plaintiff asserts that this type of circumstantial evidence can be used to establish the requisite causal connection under the direct method.  (*Id.*)  The Court finds that for all the reasons discussed *supra* in this opinion, Plaintiff has failed to produce any evidence that Defendant's decision not to renew his Principal contract was based on anything other than his own performance and conduct.  Accordingly, Plaintiff has failed to establish that there was a causal connection between his alleged protected activity and his November 22, 2004, written reprimand.  Plaintiff has also failed to establish a causal connection between his alleged protected activity and the School Board's decision not to renew his Principal contract.

50

Even assuming *arguendo* that Plaintiff can establish a prima facie case under the direct method by demonstrating that he was subjected to adverse employment actions which were causally connected to his alleged protected activity, Defendant has presented evidence that it would taken the same disciplinary and termination actions regardless of Plaintiff's participation in the alleged protected activity. As discussed, Defendant's disciplinary and termination actions were based on Plaintiff's work-related performance. Accordingly, Plaintiff has failed to establish that his participation in any alleged protected activity was the "but for" cause of Defendant's disciplinary and termination actions. *Haywood,* 323 F.3d at 531.

On the basis of the foregoing, when viewing the evidence in the light most favorable to Plaintiff, a fair-minded jury could not return a verdict for him on the evidence presented as it relates to his retaliation claim.


### CONCLUSION

Defendant's Motion for Summary Judgment [DE 15] is **GRANTED** and Defendant's Motion Regarding Inadmissibility of Some Exhibits Relied Upon by Plaintiff in his Response in Opposition to Defendant's Motion for Summary Judgment [DE 25] is **DENIED AS MOOT**.

SO ORDERED on January 11, 2008.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE

51